UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 14CV23336 - FAM

SECURITIES AND EXCHANGE COMMISSION,          )
                                             )
                Plaintiff,                   )
                                             )
v.                                           )
                                             )
ABATEMENT CORP. HOLDING COMPANY LIMITED,     )
                                             )
                Defendant, and               )
                                             )
BRENDA M. DAVIS                              )
INTERNATIONAL BALANCED FUND,                 )
                                             )
                Relief Defendants.           )
_____ )

FILED by _____ D.C.

SEP 10 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW
IN SUPPORT OF ITS EMERGENCY MOTION FOR
ASSET FREEZE AND OTHER RELIEF

I.    Introduction

During the ten years before his death in May 2014, Joseph Laurer, operating through

Abatement Corp. Holding Company Limited, a Turks and Caicos Islands company, perpetrated

an investment fraud that since at least 2007 was a full-fledged Ponzi scheme.  Laurer's victims

were approximately 50 people he knew from the Homestead area, who between 2004 and 2014

provided him almost $4.7 million to invest.  Laurer represented that Abatement controlled a bond

fund, which invested in triple-A rated corporate and government bonds, paid a guaranteed fixed

return, and presented no risk of principal loss due to insurance from the Federal Deposit

Insurance Corporation, the Securities Investor Protection Corporation, or both.  Laurer sent

investors semiannual statements purporting to show their accounts' value.

It was all a lie.  Abatement had no relationship with the FDIC or SIPC, and it invested nothing in corporate or government bonds.  Moreover, by at least as early as 2007, Abatement became nothing more than a Ponzi scheme, with Laurer simply receiving investor money and paying it out in the form of "returns" to and withdrawals by investors, as well as a healthy sum misappropriated for various personal expenses.  The statements were fictitious:  as of December 31, 2013, the statements reflected collective account values of $4,044,000 at a time when Abatement and Relief Defendant International Balanced Fund ("IBF")—another Laurer controlled entity—had assets of only $1,355,000.

Laurer misappropriated more than $1 million of investors' funds to funnel money and property to his wife, Relief Defendant Brenda Davis:  $594,000 in direct payments and $456,000 in real estate Abatement and IBF purchased in her name.  Laurer also used investor money to pay a majority of the premiums on a life insurance policy, and Davis recently received the $510,000 death benefit.

Based on these facts, the Court should enter an order freezing all of the assets of Abatement, IBF, and Davis.  The Court has the power to freeze assets—including a relief defendant's assets—up to the amount of a likely disgorgement award.  To obtain an asset freeze, the Commission need only demonstrate a reasonable approximation of the disgorgement award and is not required to trace the ill-gotten gains to the assets it seeks to freeze.  A total freeze is appropriate when the likely disgorgement award exceeds the value of the assets sought to be frozen.

Here, a total freeze is appropriate.  Abatement and IBF collectively control under $1 million, far less than the amount of investor funds they received.  With respect to Davis, the likely disgorgement award exceeds $1.3 million, consisting of the $594,000 in direct payments,

the $456,000 in real estate purchases, and $338,000 of the life insurance proceeds (representing the portion of the death benefit attributable to investor-paid premiums), an amount far greater than her known assets.  The Court should therefore grant the Commission the asset freeze it is seeking.

## II.    Statement of Facts

### A.    Background

Joseph V. Laurer, 69 when he died, married Davis, now 64, on December 25, 2007, and they remained married at the time of his death.[1]  Laurer and Davis resided in Homestead,[2] where Laurer participated actively in community life, serving as a trustee of Homestead's employee pension board, president of the South Dade chapter of the AARP, and an officer of the Leisure City Moose Lodge of Homestead.[3]

### B.    Laurer Forms Companies and Opens Account

#### 1.    International Balanced Fund

On February 17, 1994, International Balanced Fund ("IBF") was incorporated in Delaware.  It was still in good standing as of August 2014.[4]  Laurer was IBF's sole director.[5]  On

---

[1] Ex. 1 (Laurer Passport); Ex. 2 (Laurer Death Certificate); Ex. 3 (Clerk's Marriage License Data). References in this form are to the Exhibits to the Commission's Emergency Motion for Asset Freeze and Other Relief.

[2] Ex. 3 (Clerk's Marriage License Data).

[3] Ex. 4 (financial disclosure form for Homestead Employee Pension Board); Ex.5 (annual corporate report for South Dade AARP chapter); Ex. 6 (Declaration of Binay Reynolds).

[4] Ex. 7 (IBF Certificate of Incorporation); Ex. 8 (IBF Certificate of Good Standing).

[5] Ex. 9 (IBF Franchise Tax Report).

February 25, 1994, Laurer opened an account in IBF's name at a predecessor to Bank of America (the "IBF Account").[6]

### 2.       Abatement Corp. Holding Company Limited

On May 11, 1994, Abatement Corp. Holding Company Limited was incorporated in the Turks and Caicos Islands, where it was still in good standing as of April 2014.[7] Also on May 11, 1994, Laurer, signing as "Dr. Josef von Laurer," applied to open an account in Abatement's name at the Turks and Caicos Banking Company ("TCBC"), requesting that TCBC send correspondence to Laurer at a Post Office Box in Key Largo.[8] In documents submitted to TCBC, Laurer represented himself as Abatement's Chairman and Secretary.[9] TCBC opened an account (the "Abatement TCBC Account"), with Laurer signing the Account Agreement on Abatement's behalf.[10]

In late May 1994, Abatement opened a brokerage account at Charles Schwab & Co., Inc. (the "Abatement Schwab Account"), with Laurer signing as Josef V. Laurer, Abatement's President and Secretary.[11]

### C.       Laurer Fraudulently Obtains Money from Investors

### 1.       The Representations and Investments

At least as early as 2004, Laurer was raising money from investors for the alleged purpose of investing in securities.[12]  Susan and Kenneth Genevish, who had met the Laurers

---

[6]Ex. 10 (IBF Signature Card).  The account was opened at Barnett Bank.  *See Bank of America, N.A. v. FDIC*, 244 F.3d 1309, 1311 n.1 (11th Cir. 2001) (noting Bank of America's acquisition of Barnett).

[7]Ex. 11 (Abatement Certificate of Incorporation); Ex. 12 (Abatement Certificate of Good Standing).

[8]Ex. 13 (Abatement TCBC Account Application).

[9]Ex. 14 (Abatement Board of Directors' Resolution for TCBC).

[10]Ex. 15 (Abatement TCBC Account Agreement).

[11]Ex. 16 (Abatement Schwab Corporation Account Form).

socially, made their first investment of $25,000 in April 2005.[13]  Prior to investing, Laurer gave them a brochure inviting them to become a client of "Abatement (Bank) Corporation Holding Company, Ltd.," a Turks and Caicos company.[14]   According to the brochure, Laurer was a director of Abatement, which managed the International Balanced Bond Fund ("IBBF").  IBBF purportedly invested in triple-A rated corporate and government bonds, and was guaranteed by "the US Securities Investment Protection Corporation . . . the government organization which also guarantees all bank deposits."  Laurer also represented orally that both SIPC and the Federal Deposit Insurance Corporation ("FDIC") guaranteed the investment.[15]

Approximately 50 people invested from November 2004 through May 2014.[16] Statements from six tell a similar story:  Laurer, who they met socially, made oral and written representations that his bond fund could provide a guaranteed fixed interest rate with no risk to principal due to FDIC and/or SIPC insurance.[17]

Abatement also made representations via the Internet.   At www.abatementcorp.com, Abatement represented that IBBF was one of its funds, investing in "[t]op rated corporate bonds and US Treasuries," with investors' "principal . . . always 100% guaranteed" by SIPC.[18]  At

---

[12]Ex. 17, ¶ 8a (Declaration of Mark Dee).

[13]Ex. 18, ¶¶ 2-4 (Declaration of Susan Genevish).

[14]*Id.*, Ex. B.

[15]*Id.*, ¶ 5.

[16]Ex. 17, ¶ 8a (Declaration of Mark Dee).

[17]Ex. 6, ¶¶ 2-6 & Ex. A-B (Declaration of Binay Reynolds); Ex. 19, ¶¶ 3-11 & Ex. A-H (Declaration of Michael Guill) (unlike most investors, Guill thought he was investing in equities rather than bonds); Ex. 20, ¶¶ 2-8 & Ex. A-E (Declaration of Sue Davidson); Ex. 21, ¶¶ 3-7 & Ex. A-B (Declaration of Eric Hoiaas) (Hoiass was Laurer's step-son from a prior marriage); Ex. 22, at 16-29 (testimony of Evelyn Martin).

[18]Ex. 23 (pages from abatementcorp. website); Ex. 24 (abatementcorp domain name registration information).

www.ibfgp.com, Abatement stated the IBBF Fund was tax free and invested in "the best US listed corporate and government bonds." The site's "Frequently Asked Questions" section states:

> Q.    Are my funds offshore?
> A.    No, they are in the USA
>
>            *    *    *    *
>
> Q.    Are my investments guaranteed?
> A.    Yes. All investments are guaranteed via the F.D.I.C. or the S.I.P.C.[19]

### 2.    The Falsity of the Representations

Contrary to Laurer's representations, neither the FDIC nor SIPC provided any guarantee of investors' principal, Abatement invested no money in bonds, and Abatement held substantial investor funds outside the United States in the Turks and Caicos.[20] Even worse, since at least as early as 2007 through May 2014, Laurer ran Abatement as a classic Ponzi scheme. Laurer invested none of the millions investors provided during this period in bonds, using the money instead to pay returns to investors, fund investor withdrawals, and pay personal expenses.[21] Abatement provided statements to investors concealing the ongoing misappropriation. For example, with respect to the statements dated December 31, 2013, a $2.7 million gap existed between the paper value of investors' holdings ($4,044,000) and the total assets held by Abatement and IBF ($1,355,000).[22]

---

[19]Ex. 25 (pages from ibfgp website); Ex. 26 (ibfgp domain name registration information).

[20]Ex. 17 (Dee Declaration), ¶¶ 8, 9c, 11; Ex. 27 (Siemers Declaration).

[21]Ex. 17, ¶¶ 6c(ii)-6c(vi), 8b, 8c (Dee Declaration).

[22]*Id.*, ¶ 10.

### 3.      The Flow of Abatement and IBF Funds

Based on the records the Commission currently has:[23]

- From November 2004 through June 2014, approximately 50 people provided $4,668,000 to Laurer and Abatement to invest, which Laurer deposited as follows:

| Period | Account | Amount |
|---|---|---|
| November 2004 to June 2009 | Abatement Schwab Account | $1,553,000 |
| January 2008 to March 2014 | IBF Account | $1,331,000 |
| January 2013 to May 2014 | Abatement TCBC Account | $1,772,000 |

- Between July 2007 and May 2014, Laurer made net transfers of $1,418,000 from the Abatement TCBC Account to the IBF Account.

- From November 2004 through May 2014, Laurer paid $2,903,000 to or on behalf of investors, representing alleged returns on investment and withdrawals:  $860,000 from the Abatement TCBC Account, $421,000 from the Abatement Schwab Account, and $1,622,000 from the IBF Account.

- Laurer used more than $1 million in investor funds for the benefit of Davis, as described below.

### 4.      Davis Benefits from Laurer's Fraud

#### a.      Direct Payments to Davis

From May 2009 through May 2014, Laurer provided Davis checks drawn on the IBF Account totaling $602,000, which, after crediting Davis $8,000 for a check she deposited into the account, leaves a net benefit to Davis of $594,000. [24]

#### b.      Purchase of Real Estate in Davis's Name

In August 2007, Davis received a deed to a Homestead residential property she still owns.[25]  Abatement paid $394,341.42 of the $411,000 purchase price.[26]

---

[23]*Id.*, ¶¶ 4, 6b(i), 8a, 8b.

[24]*Id.*, ¶ 6b(iii)(a), 6c(ii).

[25]Ex. 28 (2705 Augusta Deed); Ex. 29 (2705 Augusta property appraiser record).

In August 2008, Davis received a deed to a second Homestead residential property she still owns.[27]  Of the $64,900 purchase price, IBF paid $2,000 and Abatement paid $60,218.93.[28]

c.      Receipt by Davis of Proceeds of Life Insurance Policy

In April 2004, John Hancock Life Insurance Company (U.S.A.) ("Hancock") issued a $500,000 life insurance policy to Laurer, who named Davis as beneficiary.[29]  To pay the $72,500 in premiums prior to his death, Laurer used $32,000 from the Abatement Schwab Account and $16,000 from the IBF Account.  The source of the other $24,000 remains unidentified.[30]

On July 25, 2014, Hancock paid Davis the death benefit of $510,867.40 by opening a "Safe Access Account" on Davis's behalf.[31]   The Safe Access Account functions as a withdrawal-only, interest bearing checking account, with the account owner having the right to "immediate access to all of [her] funds."[32]

---

[26]Ex. 30 (2705 Augusta, Closing Attorney's Balance Sheet and Category Report); Ex. 31, at p.12 (Abatement Schwab Account Statement for August 2007).  The Closing Attorney's records show $394,341.42 "Due From Buyer" received via wire transfer on August 22, 2007.  The Schwab records show an outgoing wire transfer of that exact amount on that same date.

[27]Ex. 32 (2506 SE 19th Deed); Ex. 33 (property appraiser record).

[28]Ex. 34 (title company records showing sources of funds for purchase of 2506 SE 19th Place).

[29]Ex. 35 (policy); Ex. 36 (application); Ex. 37 (application supplement designating Davis as beneficiary).

[30]Ex. 17, ¶ 9 (Dee Declaration).  With respect to the IBF Account, the Commission has copies of the checks drawn on the account payable to Hancock.  With respect to the Abatement Schwab Account, the Commission has copies of two of the checks; with respect to the others, the Schwab statements show checks in the same amount and approximate date as indicated in Hancock's records.  *Id.*

[31]Ex. 38 (Safe Access Account Paperwork).

[32]Ex. 39 (Hancock Brochure for Safe Access Account).

### 5.   Use of Funds Shortly Before and After Laurer's Death

#### a.   IBF Account

As of May 7, 2014, the IBF Account had a balance of $19,178.  On Friday, May 9, 2014, Abatement wired $109,000 from the Abatement TCBC Account to the IBF Account.[33] Sometime that weekend, Laurer was admitted to Homestead Hospital,[34] where he died May 15.

Subsequent to the $109,000 deposit, the balance in the IBF Account shrunk from $128,162.75 to $82,563.35 as of June 6, 2014.[35]  Of this reduction, $35,697 represented ATM withdrawals and checks written on or after May 12, 2014, as follows:[36]

| DESCRIPTION | AMOUNT |
|---|---|
| ATM Withdrawals (7 between May 13, 2014 and May 21, 2014) | $3,800 |
| Checks to Davis (2 between May 13, 2014 and May 15, 2014) | $20,000 |
| Check to Chris Denis (Laurer's Assistant) | $5,700 |
| Checks to Investors or in Payment of Investor Credit Card Debt | $6,197 |

#### b.   Insurance Proceeds

On August 20, 2014, Davis paid $6,872.13 from her Hancock Safe Access Account to Brickell Luxury Motors, a Miami used-car dealer.[37]  Davis has proffered she used these funds to pay-off a car lease on which she was underwater.

## IV.   An Asset Freeze is Appropriate

### A.   Standard for Asset Freeze

The Court may order an asset freeze "as a means of preserving funds for the equitable remedy of disgorgement."  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005);

---

[33]Ex. 17, ¶¶ 7a, 7b (Dee Declaration).

[34]Ex. 21, Exh. 5 (Hoiass Declaration).

[35]Ex. 17, ¶ 7c, 7d (Dee Declaration).

[36]*Id.* ¶ 7e.  Not included in the table is a May 9, 2014 $2,500 check payable to Akerman, Davis's counsel. IBF previously paid Akerman $5,000 on April 11, 2014.  *Id.* ¶ 6c(ix).

[37]Ex. 40 (Safe Access Check to Brickell Luxury Motors); Ex. 17 (Dee Declaration), ¶ 12.

*accord CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008). "The SEC's burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light:  a reasonable approximation of a defendant's ill-gotten gains is required.  Exactitude is not . . . ." *ETS Payphones*, 408 F.3d at 735 (citation, quotation, and alteration omitted); *accord FTC v. IAB Marketing Associates, LP.*, 746 F.3d 1228, 1234 (11th Cir. 2014).  The Commission's burden to demonstrate the potential for dissipation of funds is even lighter.  *See FTC v. IAB Marketing Associates, LP v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze.") (citing *ETS Payphones*, 408 F.3d at 734, and *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2006)); *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) ("[T]he SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . .").

The Court's power to freeze assets extends to relief defendants.  *See CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *CFTC v. International Berkshire Group Holdings, Inc.*, 2006 WL 3716390, *10 (S.D. Fla. Nov. 3, 2006). A relief defendant is a party not charged with wrongdoing who nevertheless "possesses illegally obtained profits but has no legitimate claim to them." *SEC v. Huff*, 758 F. Supp. 2d 1288, 1362 (S.D. Fla. 2010) (Rosenbaum, M.J.), *aff'd on other grounds*, 455 F. App'x 882 (11th Cir. 2012) (unpublished).   To obtain a freeze of a relief defendant's assets, the Commission "must demonstrate only that [it] is likely ultimately to succeed in disgorging the frozen funds." *Walsh*, 618 F.3d at 225.

### B.        Abatement and Laurer Violated the Securities Laws

The Commission has met its burden of making a prima facie showing of violations of the securities laws supporting an order of disgorgement.  Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, which proscribe fraudulent conduct in connection with the purchase or sale of securities, prohibit essentially the same type of conduct.  *See SEC v. Monterosso*, 756 F.3d 1326, 1333-34 (11th Cir. 2014).  To establish a violation of Exchange Act Section 10(b) and Rule 10b-5, the Commission must show:

    (1)      material misrepresentations or materially misleading omissions,

    (2)      in connection with the purchase or sale of securities,

    (3)      made with scienter.

*SEC v. Goble*, 682 F.3d 934, 942-43 (11th Cir. 2012).[38]  The Commission must also demonstrate the use of the mails or any means or instrumentality of "transportation or communication in interstate commerce," 15 U.S.C. § 77q(a) (Securities Act), or "interstate commerce," 15 U.S.C. § 78j (Exchange Act).

### 1.        Abatement and Laurer Made Material Misrepresentations and Misleading Omissions

Abatement and Laurer falsely stated they were placing investors' money into a fund containing high quality bonds with no risk to principal due to FDIC and SIPC insurance.  However, no such bonds or insurance existed.  Moreover, Laurer concealed the fact he was

---

[38]Only Exchange Act Section 10(b) and Securities Act Section 17(a)(1) require proof of scienter. Violations of Securities Act Sections 17(a)(2) and 17(a)(3) may be established by a showing of negligence. *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014).

operating a Ponzi scheme.  From at least as early as July 2007 through May 2014, Abatement was little more than a bank account that received investor funds and used them to pay returns to investors, fund investor withdrawals, and pay Laurer and Davis's living expenses.  Thus Abatement and Laurer clearly made false statements and omitted facts.

These matters were material.  A stated or omitted fact "is material if there is a substantial likelihood that a reasonable purchaser . . . of a security . . . would consider the fact important in deciding whether to buy or sell the security . . . ."  *Goble*, 682 F.3d at 944 (quotation omitted). Clearly the facts that:

    (a)    the FDIC and SIPC were not insuring investors' principal,

    (b)    Laurer was not investing money in high quality bonds,

    (c)    Laurer was distributing investors' funds Ponzi-style to pay returns to other investors,

    (d)    Laurer was misappropriating money for himself and Davis, and

    (e)    the account statements investors were receiving bore no relation to reality,

are "so obviously important to the investor, that reasonable minds cannot differ on the question of materiality."  *SEC v. Merkin*, 2012 WL 5245561, *7 (S.D. Fla. Oct. 3, 2012).

    **2.**    **The False Representations Were in Connection the Sale of Securities**

        **a.**    **As a Purported Bond Fund,  IBBF, Even if Non-Existent, Was a Security**

Abatement's written materials, including its websites, represent IBBF as a fund investing in corporate and government bonds.  As such, IBBF would be a security.  *See Tcherepnin v. Knight*, 389 U.S. 332, 343 (1967) ("[W]e have little doubt that [mutual fund] shares are securities within the meaning of the Securities Exchange Act."); *SEC v. U.S. Pension Trust Corp.*, 2010 WL 3894082, *21 (S.D. Fla. Sept. 30, 2010) (same), *aff'd on other grounds*, 444 F.

App'x. 435 (11th Cir. 2011) (unpublished).  The fact IBBF apparently did not exist (or, if it did exist, never bought any bonds), does not change this conclusion, as the securities laws apply to purported, counterfeited, or otherwise nonexistent securities.  *See United States v. Schlei*, 122 F.3d 944, 972-73 (11th Cir. 1997) ("[C]ounterfeit, forged, and nonexistent securities are included within the definition of a security."); *First National Bank of Las Vegas, New Mexico v. Estate of Russell*, 657 F.2d 668, 673 n.16 (5th Cir. Unit A Sept. 23, 1981) ("The antifraud provisions of section 10(b) and Rule 10b-5 have been held applicable even in situations when a broker-dealer purported to sell nonexistent securities or securities that were to be issued in the future.).  Therefore, the purported interests in IBBF were securities.

### b.      Laurer and Abatement Sold Investment Contracts

Investments into Abatement's purported fund were also investment contracts, and thus securities.  *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(10) (defining security to include investment contracts under Securities Act and Exchange Act).  Under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), an investment contract exists if there is "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." *SEC v. Unique Financial Concepts*, 196 F.3d 1195, 1199 (11th Cir. 1999).  The elements are all satisfied here.

### i.      Investment of Money

The investors all provided Laurer with money:  most for the purpose of investing in the IBBF bond fund; at least one for the purpose of investing in stocks.

### ii.      Common Enterprise

The "common enterprise" has been addressed in terms of both horizontal and vertical commonality.   The Eleventh Circuit applies a standard of "broad" vertical commonality,

requiring only a finding that investors' fortunes were "inextricably tied to the efficacy of the [promoter]." *Unique Financial*, 196 F.3d at 1199 (citation and quotation omitted). Vertical commonality exists when an investment manager or promoter makes investment decisions on behalf of the investor. *SEC v. Continental Commodities Corp.*, 497 F.2d 516, 522-23 (5th Cir. 1974) (commonality present when "investors inexorably rely on [promoter's] guidance for the success of their investment"); *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 671 (N.D. Ga. 1983) (relationship between investment manager and client satisfied vertical commonality). Commonality is also satisfied in the Ponzi scenario, since investors are, unknowingly, relying on the promoter's ability to obtain new investors. *See ETS Payphones, Inc.*, 408 F.3d at 732; *Unique Financial*, 196 F.3d at 1200 (common enterprise element satisfied even if "investment company's operations are a sham"); *cf. SEC v. SG Ltd.*, 265 F.3d 42, 51 (1st Cir. 2001) ("Ponzi schemes typically satisfy the horizontal commonality standard.").

Here, commonality is established because investors were passive, relying on Laurer and Abatement's purported skill in creating and managing a bond fund that could pay guaranteed fixed returns with no risk to principal. Commonality is also present because Laurer was operating a Ponzi scheme: investors' receipt of what they believed to be their returns and withdrawals depended upon Laurer's continuing ability to raise new money, which ended upon his death.

### iii.    Expectation of Profits from Efforts of Others

The fixed returns Laurer promised investors are "profits" for purposes of the expectation-of-profits test. *See SEC v. Edwards*, 500 U.S. 389 (2004). As for profits being derived "solely" from the efforts of others, "'solely' is not interpreted restrictively." *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 754 (11th Cir. 2007). "[T]he focus is on the dependency of the investor on

the entrepreneurial or managerial skills of a promoter or other party." *Id.* at 755 (citation and quotation omitted). When a legitimate trading account is involved, control turns on "whether the broker has control over the profitability of the account . . . or whether the investor himself has control . . . ." *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 915 (11th Cir. 1987)  In the scenario where investments are not made as represented, such as a Ponzi scheme, the efforts-of-others prong is satisfied because "investors retain[] no control over their investments, since there [are] no investments to control." *Unique Financial*, 196 F.3d at 1201.

In this case, the efforts-of-others standard is satisfied. Even if IBBF were a legitimate investment vehicle, Laurer and Abatement retained total control over IBBF's profitability. Investors were sold a fund managed by Laurer and Abatement: all investors had to do was give Laurer their money and the guaranteed fixed returns would flow, with periodic statements and payment of purported returns and withdrawals confirming all was well. IBBF of course was not legitimate—there were "no investments to control"—thus satisfying the efforts-of-others prong even if investors thought they had some control over IBBF's profitability. Therefore, *Howey*'s elements are satisfied.

### 3.    Laurer and Abatement Acted With Scienter

Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Extreme recklessness also satisfies the scienter requirement. *See McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989). Here, in light of Laurer's control of the accounts of Abatement and IBF, his personal solicitation of investors, and his deposit and spending of investor funds, he had to know he was buying no bonds, misappropriating investor money, and providing fake account statements. He

also had no basis for representing investments as FDIC or SIPC insured.  Therefore, Abatement and Laurer acted with scienter.

### 4.    Abatement and Laurer Utilized Interstate Commerce

Laurer and Abatement's use of the Internet to promote IBBF fund suffices to establish the interstate commerce requirement.  *SEC v. Spinosa*, 2014 WL 2938487, *4 (S.D. Fla. June 30, 2014); *SEC v. GMC Holding Corp.*, 2009 WL 506872, *4 (M.D. Fla. Feb. 27, 2009).  Laurer and Abatement's transportation of investors checks from the United States to the Turks and Caicos for deposit into the Abatement TCBC Account and the wiring of funds from that account back to the IBF Account in the United States independently satisfies the interstate commerce requirement.  *See* 15 U.S.C. §§ 77b(a)(7), 78c(a)(17) ("interstate" defined to include commerce and communications between a state and a foreign country).  Therefore, all the elements of an anti-fraud claim against Abatement and Laurer under the Securities Act and the Exchange Act are satisfied here.

### C.    Disgorgement is An Appropriate Remedy

### 1.    Abatement and IBF

"Disgorgement is an equitable remedy intended to prevent unjust enrichment."  *SEC v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014).  Abatement obtained $3,337,000 in investor money by fraud; IBF obtained $2,749,000 in direct deposits of investor funds and monies Laurer transferred to IBF from the Abatement TCBC Account.  These "reasonable approximation[s] of the defendant[s'] unlawfully acquired assets . . . shift[] [the burden] to the defendants to demonstrate the SEC's estimate is not reasonable."  *Id.*  Therefore, the Commission has demonstrated a reasonable approximation of the likely disgorgement award against Abatement and IBF.

### 2.   Davis

As noted above, a disgorgement award against Davis is appropriate if she received illegally obtained funds without a legitimate claim.  A relief defendant—by definition someone *not* accused of wrongdoing—nevertheless lacks a legitimate claim to money or property received as gifts.  *See CFTC v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010); *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005).  A contrary conclusion "would allow almost any defendant to circumvent the SEC's power to recapture fraud proceeds, by the simple procedure of giving stock to friends and relatives . . . ." *SEC v. Cavanagh*, 155 F.3d 129, 137 (2d Cir. 1998).

The Commission need not trace a defendant's ill-gotten gains to assets currently possessed.  *See FTC v. Leshin*, 719 F.3d 1227, 1234 (11th Cir. 2013) ("[A] disgorgement order establishes a personal liability, which the defendant must satisfy regardless whether he retains the proceeds of his wrongdoing.") (citation and quotation omitted); *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1369 (S.D. Fla. 2006) ("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset . . . .") (citation and quotation omitted), *aff'd*, 240 F. App'x 355 (11th Cir. 2007). This rule applies with equal force to relief defendants.  *See CFTC v. Gresham*, 2012 WL 1606037, *3 (N.D. Ga. May 7, 2012) ("'An individual may be a proper relief defendant even if she does not possess the actual ill-gotten gains if she previously received benefits that were derived from another person's unlawful conduct.'") (quoting *SEC v. Aragon Capital Advisors, LLC*, 2011 WL 3278907, *18 (S.D.N.Y. July 26, 2011)).

In this case, the Commission has established a likelihood of a disgorgement order against Davis of at least $1,379,000:

(a)      Laurer paid Davis a net of $594,000 from the IBF Account at a time the account was funded almost exclusively with fraudulently obtained money;

(b)      In 2007 and 2008, Laurer used $456,560 from the Abatement Schwab Account IBF Account to purchase real estate in Davis's name; and

(c)      at least $316,000 in insurance proceeds (representing the pro rata share of the death benefit the Commission can currently trace to premiums paid with investor funds), and possibly as much as the entire $510,000 death benefit. *See Restatement (Third) of Restitution and Unjust Enrichment* (2011), § 58, illus. 12 (if partner pays life insurance premiums with misappropriated partnership funds, "[p]artnership may . . . claim the insurance proceeds in the proportion that its funds were used to pay the premium[s]"); 5 Couch on Ins. (3d ed.) § 74:38 ("When the premiums of a life insurance policy are paid in part with embezzled funds, the owner of the embezzled money is entitled to the proceeds of the policy, as against the beneficiaries, in the proportion in which the funds so appropriated paid the premiums.").[39]

---

[39] *See also New York Life Insurance Co. v. Waxenberg*, 2009 WL 632896, *8 & n.7 (M.D. Fla. Mar. 11, 2009) (noting this is the majority view and collecting cases). The Restatement of Restitution provides the following example:

> Clerk embezzles from Bank, using part of the funds to pay part of his life insurance premiums. Clerk commits suicide, leaving $1 million in noncontestable insurance to Widow and a deficit of $4 million in his accounts at Bank. . . . [T]he FDIC makes good the deficit, acquiring by assignment Bank's claim against Widow under this section. The court determines that 75 percent of Clerk's life insurance premiums were paid with funds belonging to Bank, giving the FDIC (as Bank's successor) a claim in restitution against Widow for $750,000. . . . Widow had no notice of Clerk's breach of duty, but as donee of the insurance proceeds she is prima facie liable in restitution.

*Restatement (Third) of Restitution and Unjust Enrichment* (2011), § 17, illus. 17.

Any state law exemptions, such as Florida's Homestead Exemption and a Florida statute limiting the decedent's creditors' ability to assert claims against insurance proceeds,[40] do not prevent this Court from ordering full disgorgement.  "[A] district court can ignore state law exemptions as well as other state law limitations on the ability to collect a judgment in fashioning a disgorgement order." *SEC v. Solow*, 682 F. Supp. 2d 1312, 1325 (S.D. Fla. 2010), *aff'd*, 396 F. App'x 635 (11th Cir. 2010); *see also FTC v. Leshin*, 2011 WL 617500, *14-20 (S.D. Fla. Feb. 15, 2011), *report adopted*, 2011 WL 845065 (S.D. Fla. Mar. 8, 2011); *Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272, 1282 (M.D. Fla. 2003); *SEC v. Yun*, 208 F. Supp. 2d 1279, 1283-84 (M.D. Fla. 2002).

### D.    A Total Asset Freeze is Appropriate

#### 1.    Abatement and IBF

The equities clearly support an asset freeze as to the entity defendants.  Abatement's funds are already outside the United States, and a freeze will prevent any effort to further transfer them.  With respect to IBF, there have already been $35,697 in withdrawals from the IBF Account on the eve of and subsequent to Laurer's death—a freeze will preserve what remains for disgorgement.

#### 2.    Davis

The Court should order a total freeze on Davis's assets.  Notwithstanding the fact Davis may be innocent of wrongdoing, "[a]s between [a relief] defendant[] and the victims of fraud,

---

[40]Relying on such a statute, the Florida Supreme Court limited an embezzlement victim's recovery to the premiums paid with stolen money, as opposed to the death benefit.  *See Board of Public Instruction for Bay County v. Mathis*, 181 So. 147, 149-50 (Fla. 1938).  However, even if, contrary to the Commission's argument, the Court were to allow disgorgement of only the premiums paid, this would still result in a total $1.1 million disgorgement order, which the Commission could collect from the life insurance proceeds.  *See In re Zesbaugh*, 190 B.R. 951, 953 (Bankr. M.D. Fla. 1995) (life insurance proceeds subject to claims of beneficiary's creditors).

equity dictates that the rights of the victims should control." *SEC v. Antar*, 831 F. Supp. 380, 402-03 (D.N.J. 1993). Therefore, when the assets to be frozen are worth less than the likely disgorgement award, a freeze of *all* assets is appropriate. *See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze."); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable); *FTC v. IAB Marketing*, 972 F. Supp. 2d 1307, 1313 (S.D. Fla. 2013) (denying defendants' motion to "unfreeze" funds for living expenses where "Defendants' monetary liability greatly exceeds the frozen funds"). Nor should the court permit Davis to use ill-gotten gains she has received to pay attorney's fees. *See FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, *4 (M.D. Fla. Dec. 31, 2008) (defendants "may not use their victims' assets to hire counsel to help them retain the fruits of their violations"); *CFTC v. United Investors Group, Inc.*, 2005 WL 3747596, *1 n.1 (S.D. Fla. June 9, 2005) (refusing to except living expenses and counsel fees from asset freeze), *aff'd on other grounds sub nom. CFTC v. Levy*, 541 F.3d 1102 (11th Cir. 2008). The $7500 of investor funds already used to pay counsel is more than enough.

Here a freeze of all of Davis's assets is appropriate. The likely disgorgement award of $1.3 million far exceeds the value of the Safe Access Account ($500,000) and the real estate (properties bought in August 2007 and August 2008 for, respectively, $411,000 and $64,900).[41] There is also a concern about dissipation of assets: investor money apparently formed the

---

[41]The freeze on the real estate should place no hardship on Davis: the order would simply prevent her from selling or granting a mortgage on the properties. The Commission also seeks to freeze Davis's accounts at Capital Bank, where Davis negotiated the $602,000 in checks Davis received from the IBF Account. The Commission has no evidence Davis has sufficient funds at Capital Bank to make a total freeze unnecessary.

backbone of Laurer and Davis's budget in the years prior to his death.  Absent a freeze Davis would have the opportunity to use these investor funds for living expenses and to defend this litigation.  This is not an idle concern: Davis took at least $20,000 of IBF funds during Laurer's last days, and she recently used nearly seven thousand from the Safe Access Account apparently to satisfy a debt.  Therefore, the Court should enter an order freezing all of Davis's assets pending determination of the Commission's claim for disgorgement.

## V.      Sworn Accounting, Repatriation of Funds, and Expedited Discovery

The Commission seeks an Order requiring Abatement, Davis, and IBF to file with this Court a sworn written accounting.  The accounting will document their assets, enabling the Commission to better identify funds subject to disgorgement.  *See SEC v. Lybrand*, 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000).  This Court may also order the defendants and relief defendants to repatriate assets deposited overseas.  *See SEC v. Compania Internacional Financiera*, 2011 WL 3251813, *13 (S.D.N.Y. July 29, 2011) ("[A]n order to bring assets to the United States is appropriate if needed to make effective an asset freeze and preserve assets for potential future relief.").  Finally, the Court should permit the Commission to commence discovery before the meeting of the parties and to do so on an expedited basis.  *See* Fed. R. Civ. P. 26(d)(1) (providing that court may permit discovery to prior to the Rule 26(f) conference); *FTC v. IAB Marketing Associates, LP*, 2012 WL 4936087, *18-19 (S.D. Fla. Oct. 9, 2012) (permitting expedited discovery); *CFTC v. Chandler*, 2012 WL 5382903, *3-4 (M.D. Fla. Sept. 11, 2012) (same).

## CONCLUSION

For the reasons set forth above, the Commission requests that the Court grant the Commission's Emergency Motion for Asset Freeze and Other Relief and enter the Commission's proposed form of order.

September 10, 2014

Respectfully submitted,

By:     s/Andrew O. Schiff
        Andrew O. Schiff
        Senior Trial Counsel
        S.D. Fla. No. A5501900
        Direct Dial: (305) 982-6390
        E-mail: SchiffA@sec.gov
        *Lead Attorney*

        Terence M. Tennant
        Senior Counsel
        Florida Bar No. 0739881
        Direct Dial: (305) 982-6346

        Attorneys for Plaintiff
        **SECURITIES AND EXCHANGE
        COMMISSION**
        801 Brickell Avenue, Suite 1800
        Miami, Florida 33131
        Telephone: (305) 982-6300
        Facsimile: (305) 536-4154

22